FILED

2022 Jan-04  PM 03:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **GREGORY MCDANIEL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  7:20-CV-01271** |
| | } | |
| **NANCY BERRYHILL,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,**[1] | } | |
| | } | |
| **Defendant.** | } | |

### MEMORANDUM OPINION

Gregory McDaniel has asked the Court to review a final adverse decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).  The Commissioner denied Mr. McDaniel's claim for Supplemental Security Income and Disability Insurance Benefits, finding that Mr. McDaniel was not under a disability from May 21, 2015 through December 13, 2019.  Mr. McDaniel contends that, since his onset date, he has suffered from mental health conditions that have prevented him from working.  Mr. McDaniel argues that the Administrative Law Judge—the ALJ—

---

[1] The Court asks the Clerk to please substitute Kilolo Kijakazi for Nancy Berryhill as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 25(d) (When a public officer leaves office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

misunderstood his mental health treatment records, erred in rejecting the opinions of Dr. Hodo and Dr. Houston, and erred in finding that he does not meet listing 12.04. Mr. McDaniel contends that the ALJ misapplied the law and that the ALJ's decision does not rest on substantial evidence. For the reasons that follow, the Court finds that substantial evidence supports the Commissioner's decision.

## BACKGROUND

To succeed in his administrative proceedings, Mr. McDaniel had to prove that he was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013) (citing *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003)). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin*, 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[2]

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC")

---

[2] "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (last visited Oct. 6, 2021).

assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

"The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

Because Mr. McDaniel seeks disability insurance benefits, the ALJ had to determine whether Mr. McDaniel was insured when he became disabled. (Doc. 9-3, pp. 16-17). "For SSI-claims, a claimant becomes eligible in the first month where she is both disabled and has an SSI application on file." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing 20 C.F.R. § 416.202-03 (2005)).

Mr. McDaniel applied for supplemental security income on February 9, 2016, and for a period of disability and disability insurance benefits on February 19, 2016. (Doc. 9-6, pp. 2, 8).[3]  Mr. McDaniel alleged that his disability began October 15,

---

[3] Mr. McDaniel's application summaries for supplemental security income and disability insurance benefits indicate that Mr. McDaniel applied on February 9 and 19, 2016, but the Disability Determination and Transmittal, Disability Determination Explanation, and the ALJ's initial decision list his application date as January 28, 2016. (Doc. 9-4, pp. 19-20, 22, 51; Doc. 9-6, pp. 2, 8).

2013 but amended his onset date at the administrative hearing to May 21, 2015. (Doc. 9-6, pp. 2, 8; Doc. 9-3, p. 58). The Commissioner initially denied Mr. McDaniel's claims on May 23, 2016. (Doc. 9-5, pp. 2, 7). Mr. McDaniel requested a hearing before an ALJ. (Doc. 9-5, p. 16). The ALJ issued an unfavorable decision on June 15, 2018. (Doc. 9-4, p. 48). The Appeals Council then granted Mr. McDaniel's request for review and returned the case to the ALJ to examine Mr. McDaniel's maximum residual functional capacity. (Doc. 9-4, pp. 64-66). The Appeals Council instructed the ALJ to evaluate the opinion of Dr. Hodo, to explain the weight given to Dr. Hodo's opinions, and to expand the record and obtain supplemental evidence if necessary. (Doc. 9-4, pp. 64-66). The following evidence is in the administrative record before the Court.

### I.  Mr. McDaniel's Medical Evidence

Mr. McDaniel's records are extensive. The records relevant to this appeal are medical opinions from two consultative examinations, mental health treatment records from Indian Rivers Mental Health Center, and medical records from two emergency departments and Whatley Health Services. The Court discusses those records in chronological order.

Mr. McDaniel was born in 1964. (Doc. 9-8, p. 89). On May 21, 2015, Mr. McDaniel went to the emergency room at DCH Regional Medical Center complaining of chest pain with nausea, shortness of breath, and left-hand numbness.

(Doc. 9-8, p. 89). Mr. McDaniel stated that his chest pain had started an hour before he arrived and that he had experienced similar symptoms earlier in the week. (Doc. 9-8, p. 96). Mr. McDaniel reported that he had been out of his blood pressure medication for several months. (Doc. 9-8, p. 96).[4] Mr. McDaniel's blood pressure was elevated. The ER doctor admitted him. (Doc. 9-8, p. 89). Mr. McDaniel denied suicidal thoughts or a history of mental illness, and the nurse wrote that his mood was normal and that he was alert. (Doc. 9-8, pp. 97-99). Mr. McDaniel was discharged the following day after his blood pressure was better-controlled. (Doc. 9-8, pp. 89, 95). He was told to follow up with his primary care physician in one week. (Doc. 9-8, p. 89). The Court has not found a record of a one-week follow-up in the administrative record.

Mr. McDaniel went to the emergency room again on July 21, 2015. He reported that he was having a nervous breakdown. (Doc. 9-10, p. 29). Mr. McDaniel attributed his nervous breakdown to financial issues, explaining that he had been unemployed for four years and that he had tried unsuccessfully "to get on disability." (Doc. 9-10, p. 29). He reported intermittent suicidal and homicidal ideations but denied having a plan and stated that he felt depressed and could sometimes hear

---

[4] Mr. McDaniel had a prescription for Benazepril. The prescription called for one tablet daily. (Doc. 9-8, p. 90). "Benazepril is used to treat high blood pressure (hypertension)." https://www.webmd.com/drugs/2/drug-4682/benazepril-oral/details. (last visited Dec. 15, 2021). Mr. McDaniel also had a prescription for Zyrtec-D, "an antihistamine used to relieve allergy symptoms such as watery eyes, runny nose, itching eyes/nose, sneezing, hives, and itching." https://www.webmd.com/drugs/2/drug-12127/zyrtec-oral/details. (last visited Dec. 15, 2021).

voices.  (Doc. 9-10, p. 29).  The doctor noted that Mr. McDaniel was calm, cooperative, and in no apparent distress.  (Doc. 9-10, pp. 29-31).  Mr. McDaniel did not meet the criteria for admission because he did not "appear to be gravely disabled by psychiatric illness or substance use."  (Doc. 9-10, p. 33).  Because he was competent, Mr. McDaniel could not be held on an involuntary psychiatric hold. (Doc. 9-10, p. 33).  At discharge, Mr. McDaniel was medically stable and denied suicidal or homicidal ideations, citing his religion.  (Doc. 9-10, p. 34).  Mr. McDaniel received a new prescription for Benazepril and a prescription for a beta blocker. (Doc. 9-10, p. 34).

Less than a month later, Mr. McDaniel returned to the emergency room, complaining again of a nervous breakdown.  (Doc. 9-10, p. 22).  He attributed his depression to loneliness and his job loss four years earlier.  (Doc. 9-10, p. 22).  Mr. McDaniel reported that he heard voices and songs and took blood pressure pills in a suicide attempt.  He stated that he "wouldn't mind hurting somebody up where [he] live[d]."  (Doc. 9-10, p. 22).  The doctor determined that Mr. McDaniel met the criteria for psychiatric admission as he appeared "to be gravely disabled" by his psychiatric illness and was at risk for harming himself or others.  (Doc. 9-10, p. 26).

The following day, Mr. McDaniel was discharged because he no longer was considered an imminent threat.  (Doc. 9-10, p, 20).  At discharge, Mr. McDaniel was alert with proper orientation, fair eye contact, stable affect, and "no indication of

gross delusions, illusions, or hallucinations." (Doc. 9-10, p. 21). The physician who discharged Mr. McDaniel reported that Mr. McDaniel visited the hospital because he had promised his father that he would get help, but Mr. McDaniel believed he could handle his affairs on his own. (Doc. 9-10, p. 20). The physician who discharged Mr. McDaniel reported that Mr. McDaniel's prognosis was guarded and that he would be more optimistic if Mr. McDaniel would "get[] in treatment." (Doc. 9-10, p. 20). Mr. McDaniel was diagnosed with depression and was assigned a GAF score of 30, indicating major impairment.[5] He scheduled a follow-up visit at Indian Rivers Mental Health Center. (Doc. 9-10, p. 21).

Two days later, on August 5, 2015, Mr. McDaniel visited Indian Rivers. He reported that he had a history of depression, anxiety, and hypertension. (Doc. 9-10, pp. 41-42). Mr. McDaniel stated that he would not commit suicide because of his religious beliefs, but he still had thoughts about it. He reported difficulty coping with stress, a minimal support system, and stated that he feels a major loss due to the circumstances surrounding his termination four years earlier. (Doc. 9-10, p. 42). The person who completed Mr. McDaniel's intake evaluation stated that Mr. McDaniel had a reduced appetite, was having trouble sleeping, and was feeling hopeless. (Doc. 9-10, p. 41). Mr. McDaniel had no history of mental health treatment. He indicated that he wanted to become emotionally stable. (Doc. 9-10,

---

[5] https://www.webmd.com/mental-health/gaf-scale-facts (last visited Dec. 17, 2021).

p. 41).  He was diagnosed with major depressive disorder, single episode, moderate. (Doc. 9-8, p. 148; Doc. 9-10, p. 44).

Mr. McDaniel worked with the staff at Indian Rivers to create a treatment plan.  His goal was to "express [that] he feels emotionally stable and in control of the direction of his life on most days" and "to establish coping skills and interventions to reduce daily impairment."  (Doc. 9-10, pp. 76-77).  His treatment plan consisted of prescription medication, psychiatric evaluation, therapy, and monitoring for symptoms, medication compliance, and medication effectiveness. (Doc. 9-10, pp. 77-78).  Mr. McDaniel was scheduled to have treatment and therapy at Indian Rivers at least once a month for a year.  (Doc. 9-10, p. 78).

Mr. McDaniel had an appointment at Indian Rivers for a medical evaluation and prescription review on September 29, 2015.   Mr. McDaniel received a prescription for two psychotropic drugs, Celexa and Trazadone.  (Doc. 9-8, pp. 138-39; Doc. 9-10, p. 69).  On November 16, 2015, a clinician updated Mr. McDaniel's diagnosis to include polysubstance dependence in early partial remission.  (Doc. 9-8, p. 147; Doc. 9-10, p. 69).  The clinician noted that Mr. McDaniel was to continue his treatment plan and take the medication he had been prescribed previously.  The clinician noted that Mr. McDaniel had not made progress toward his goals.  (Doc. 9-10, p. 69).

On February 25, 2016, Mr. McDaniel visited Indian Rivers for his scheduled treatment plan review. (Doc. 9-8, p. 134). The social worker that reviewed the plan noted that Mr. McDaniel had not been seen during the review period but was scheduled to see a doctor and therapist the following month and to continue his treatment plan. (Doc. 9-8, p. 134). Although Mr. McDaniel was not attending appointments regularly, the social worker determined that it was appropriate for Mr. McDaniel to continue therapy up to two times a month. (Doc. 9-8, p. 146).

At the request of the Social Security Administration, Mr. McDaniel had a psychological consultative examination by Charles E. Houston, Sr. Ph.D. on May 3, 2016. (Doc. 9-9, p. 9). Mr. McDaniel reported a history of migraine headaches, arthritis, and knee pain. (Doc. 9-9, p. 9). He told Dr. Houston that he had been in the bed 24/7 over the preceding weeks. Mr. McDaniel added that he covered his windows with black plastic and that he did not talk to anyone. (Doc. 9-9, p. 9). Dr. Houston interviewed Mr. McDaniel's mother, and she confirmed this information. (Doc. 9-9, pp. 9-10).

Dr. Houston reviewed the medical records that DDS provided to him and noted that Mr. McDaniel appeared to have suffered from depression "on and off for many years." (Doc. 9-9, p. 9). Mr. McDaniel reported that he had previously used marijuana and meth; he denied using alcohol or tobacco. (Doc. 9-9, p. 9). Dr. Houston evaluated Mr. McDaniel and found that:

> [Mr. McDaniel's] orientation was good.  His thought processes were
> scattered, and his speech was expansive.  There were no loose
> associations or confusion.  His mood and affect were appropriate.  He
> was cooperative, pleasant, interested, persistent, and could concentrate.
> He denied visual and auditory hallucinations.  He denied current
> thoughts of self-harm or thoughts of harming others.  He said his sleep
> is sporadic.  He said he eats many snacks.  He said he watches TV very
> little.  He does not do any of the housework.  He does not visit.  He
> rarely drives.

(Doc. 9-9, p. 10).  Based on his observations and review of the medical evidence,

Dr. Houston diagnosed Mr. McDaniel with "Major Depression, Chronic, Recurrent,

without psychosis, currently Moderate."  (Doc. 9-9, p. 10).  Dr. Houston determined

that Mr. McDaniel's activities and interests were somewhat restricted, but he could

perform his basic daily activities, manage his personal and financial affairs,

concentrate, and adapt well to the changing conditions of the mental evaluation.

(Doc. 9-9, p. 10).  Dr. Houston opined that Mr. McDaniel "would have some

difficulty with total independent functioning" and that his psychiatric problems and

possibly his physical condition would affect his ability to work.  (Doc. 9-9, pp. 10-

11).

On June 22, 2016, Mr. McDaniel went to the emergency room with

complaints of heavy lungs, shortness of breath, and depression.  (Doc. 9-10, p. 11).

Mr. McDaniel explained that he thought he had cancer or a disease in his lungs.

(Doc. 9-10, p. 10).  He denied suicidal or homicidal ideations but stated that he had

spent much of his time in the bed for approximately two months.  (Doc. 9-10, p. 10).

Mr. McDaniel reported that he felt like he had had a nervous breakdown the week before.  (Doc. 9-10, p. 10).  He admitted that he had stopped going to Indian Rivers and reported that he was out of his blood pressure and psychotropic medication.  (Doc. 9-10, p. 10).  The doctor noted that Mr. McDaniel was "VERY ANXIOUS" and had mild shortness of breath, but his pulmonary tests were negative, and he was stable.  (Doc. 9-10, pp. 11-13, 17).  The physician prescribed Metoprolol Tartrate and Clonazepam before discharging Mr. McDaniel with instructions to see a doctor within five days.  (Doc. 9-10, pp. 12, 18).

On July 1, 2016, Mr. McDaniel visited Whatley Health Services to follow up on his symptoms of hypertension, anxiety, and allergies.  (Doc. 9-9, p. 90).  He was evaluated by Dr. Jennifer Miller.  Mr. McDaniel reported improvement in his anxiety but indicated that functioning was somewhat difficult.  (Doc. 9-9, p. 90).  Dr. Miller prescribed Naprosyn for migraines, Paxil for anxiety, and Zyrtec for allergies.  (Doc. 9-9, p. 93).  Mr. McDaniel's psychiatric exam was normal with a notation that he was oriented to time, place, person, and situation. (Doc. 9-9, p. 92).  Dr. Miller instructed Mr. McDaniel to report to the emergency room if he had suicidal thoughts, counseled him on the importance of taking his medicine as prescribed, encouraged Mr. McDaniel to exercise, and referred him to a psychiatrist.  (Doc. 9-9, pp. 92-93).

Mr. McDaniel returned to Indian Rivers Mental Health Center on July 28, 2016 for a review of his treatment plan.  (Doc. 9-10, p. 55).  The practitioner noted

that Mr. McDaniel had not been seen during the review period but that he was scheduled to see a therapist soon for a new treatment plan. (Doc. 9-10, p. 55). The practitioner instructed Mr. McDaniel to continue his treatment plan until October 26, 2016. (Doc. 9-10, p. 55). Mr. McDaniel's interventions were updated to a quarterly review, and his twice a month therapy was determined not to be medically necessary. (Doc. 9-10, pp. 58-59).

Mr. McDaniel had a therapy appointment at Indian Rivers on August 9, 2016. (Doc. 9-10, p. 37). Mr. McDaniel participated in updating his plan and agreed to reschedule with a doctor and a therapist. (Doc. 9-10, p. 37). A practitioner noted that Mr. McDaniel had missed several appointments and was not on medication. (Doc. 9-10, p. 102). Mr. McDaniel stated that he had "decided to remain in therapy and avoid psych meds." (Doc. 9-10, p. 102). He reported feeling "restless, anxious, edgy, tense, excessive worry[], easily agitated and upset, impatient, isolative, mood swings, sad, occasionally tearful, tired, unmotivated, overwhelmed, frustrated, [] hopeless, unable to finish tasks due to boredom-distraction with racing thoughts." Mr. McDaniel denied suicidal and homicidal attempts and delusions. Mr. McDaniel reported auditory hallucinations of a radio station and music in his left ear. (Doc. 9-10, p. 102). Mr. McDaniel admitted to years of self-medicating with different substances including alcohol, cocaine, marijuana, and meth but reported that he had not used illegal drugs in two years. (Doc. 9-10, p. 102). The practitioner noted that

Mr. McDaniel was fidgety and had difficulty staying on topic.  (Doc. 9-10, p. 102).
The practitioner prescribed trial medications of Saphris, Zoloft, and Vistaril and
discontinued Celexa and Trazodone.  (Doc. 9-10, p. 102).  He was instructed on the
importance of medication and therapy compliance.  (Doc. 9-10, p. 102).

Mr. McDaniel went to Indian Rivers on November 3, 2016, for a 3-month
medication management appointment.  He had canceled his previous appointment
and had stopped taking his medication because of migraine headaches.  (Doc. 9-10,
p. 100).  The practitioner noted that Mr. McDaniel presented calmer, less fidgety,
and more focused on his health.  (Doc. 9-10, p. 100).  Mr. McDaniel requested
medication for migraines, hypertension, and allergies, and he asked for a prescription
of Benzos and Adderall.  (Doc. 9-10, p. 100).  The practitioner told Mr. McDaniel
that he needed to see an appropriate doctor for his medical issues and that
prescriptions for Adderall were not recommended.  (Doc. 9-10, p. 100).  The
practitioner noted that Mr. McDaniel tested positive in August 2016 for
amphetamine and methamphetamine but not his prescribed medications.  (Doc. 9-
10, p. 100).  After being evaluated and counseled, Mr. McDaniel was given a trial
of Depakote and Inderal for mood swings, insomnia, anger, depression, anxiety, and
untreated hypertension.  (Doc. 9-10, p. 100).

On December 22, 2016, Mr. McDaniel went to the emergency room for an
evaluation of pain in his left ear and reported that his only medication was

Metoprolol Tartrate.   (Doc. 9-10, p. 3, 8).[6]  He reported that he was anxious and having bad dreams, but he denied being suicidal. (Doc. 9-10, p. 3).  Mr. McDaniel's physical and mental evaluation produced unremarkable results.   Mr. McDaniel received a prescription for Flonase spray for allergies. (Doc. 9-10, p. 4).

Mr. McDaniel visited Indian Rivers on January 27, 2017, for medication management.   (Doc. 9-10, p. 98).   The practitioner noted that Mr. McDaniel presented calmer and less fidgety than before, and Mr. McDaniel stated that the previous medications helped him stay calm, sleep well, and manage his depression. (Doc. 9-10, p. 98).  Mr. McDaniel stated that his moods were "pretty decent" when he took his medication, that he was "more optimistic and hopeful," and that he "believe[d] he has better chances of getting disability this time per his attorney." (Doc. 9-10, p. 98).  During the appointment, Mr. McDaniel was "as usual . . . focused on medical issues like sinus and arthritic pain" and requested a prescription for Adderall.  The practitioner advised Mr. McDaniel to see a primary care provider. Mr. McDaniel stated he could not afford a primary care doctor.  (Doc. 9-10, p. 98). Mr. McDaniel denied suicidal and homicidal thoughts or "addictive personality problems."   (Doc. 9-10, p. 98).  The doctor denied Mr. McDaniel's request for

---

[6] "Metoprolol is used with or without medications to treat high blood pressure (hypertension)." https://www.webmd.com/drugs/2/drug-11207/metoprolol-tartrate-oral/details.   (last visited Dec. 15, 2021).

Adderall, continued his prescription of Depakote and Inderal, and offered a substance abuse referral. Mr. McDaniel refused the referral. (Doc. 9-10, p. 98).

At his next 3-month medication management appointment on April 19, 2017, Mr. McDaniel stated that he could not afford his Depakote prescription, but he was taking Inderal. (Doc. 9-10, p. 96). Mr. McDaniel reported that his sleep was broken and erratic without the Depakote. (Doc. 9-10, p. 96). He stated that his appetite was okay, but his moods were up and down. (Doc. 9-10, p. 96). Mr. McDaniel stated that although anxiety and sleep were issues, he was not as depressed and hopeless as he had been previously. (Doc. 9-10, p. 96). Mr. McDaniel requested Benzos and Adderall. (Doc. 9-10, p. 96). The practitioner declined his prescription request and prescribed a trial of Trintellix and Latuda. (Doc. 9-10, p. 96). Mr. McDaniel asked to return in two months due to his trial medications and upcoming disability hearing. (Doc. 9-10, p. 96). Mr. McDaniel's medical diagnosis changed from major depressive disorder to bipolar, and he was diagnosed with anxiety. (Doc. 9-10, p. 96).

On June 12, 2017, Mr. McDaniel had a medication follow up at Indian Rivers. The practitioner's notes state that Mr. McDaniel was alert, calm, and oriented. (Doc. 9-10, p. 95). The practitioner indicated that Mr. McDaniel was non-compliant with medication, but he was not suicidal or homicidal and had no psychosis. (Doc. 9-10,

p. 95).  The practitioner prescribed Depakote and instructed Mr. McDaniel to use the medication and return to the clinic in four months.  (Doc. 9-10, p. 95).

On December 20, 2017, Mr. McDaniel visited Indian Rivers.  (Doc. 9-10, p. 104).  Mr. McDaniel reported that he had not taken Depakote for several months but noted that he felt better while on it.  He asked for a new prescription.  (Doc. 9-10, p. 104).  He said he spent most days in bed but had no suicidal or homicidal ideations and no psychosis.  (Doc. 9-10, p. 104).  The practitioner prescribed Depakote and explained to Mr. McDaniel the importance of attending all appointments and complying with all prescriptions.  (Doc. 9-10, p. 104).

Dr. David W. Hodo provided a psychological consultative evaluation for Mr. McDaniel.  (Doc. 9-10, p. 107).  On February 12, 2018, in a brief report, Dr. Hodo noted that Mr. McDaniel seemed uncomfortable and anxious with some degree of depression, had a somewhat blunted effect, and had flight of ideas and trouble concentrating.  (Doc. 9-10, p. 107).  Dr. Hodo's impression was severe, chronic "Maniac [*sic*] Depressive Illness.  (Doc. 9-10, p. 108).  Dr. Hodo stated that Mr. McDaniel "should be able to manage any financial benefits awarded to him."  (Doc. 9-10, p. 108).

In a medical source opinion form, Dr. Hodo indicated that, during an eight-hour workday, Mr. McDaniel would experience marked limitations in understanding, carrying out, and remembering simple instructions; responding

16

appropriately to supervision and customers or other members of the general public; using judgment in simple work-related decisions; maintaining attention, concentration, or pace for periods of at least two hours; and maintaining activities of daily living. (Doc. 9-10, pp. 109-10). Dr. Hodo reported that Mr. McDaniel would have extreme limitations in understanding, carrying out, and remembering detailed or complex instructions; responding appropriately to co-workers; responding to customary work pressures; dealing with changes in routine work settings; and using judgment in detailed or complex work-related decisions. (Doc. 9-10, p. 109). Dr. Hodo opined that Mr. McDaniel had experienced an extreme degree of deterioration in personal habits and constriction of interests. (Doc. 9-10, p. 110). Dr. Hodo indicated that Mr. McDaniel's limitations had existed for many years and would last for 12 months or longer. (Doc. 9-10, p. 110). Dr. Hodo also indicated that Mr. McDaniel would likely deteriorate if he was placed under the stress of a job. (Doc. 9-10, p. 110). Dr. Hodo reported that medication helped Mr. McDaniel function. (Doc. 9-10, p. 110).

On March 19, 2018, Mr. McDaniel went to the DCH emergency room to seek treatment for anxiety, a migraine headache, and elevated blood pressure. (Doc. 9-11, p. 21). He stated that he had a prescription for blood pressure medication but was not taking it because he was "unable to get it filled last time." (Doc. 9-11, p. 21). Mr. McDaniel started feeling better after taking Clonidine and Toradol and was

discharged with instructions to follow up with Whatley Health Services.  (Doc. 9-11, pp. 24-26).

On April 13, 2018, Mr. McDaniel went to Indian Rivers for a 4-month appointment.  (Doc. 9-13, p. 12).  He was alert, calm, and cooperative, and he reported that he was taking Depakote.  (Doc. 9-13, p. 12).  Mr. McDaniel denied side effects, mood instability, suicidal intentions, homicidal intentions, or psychosis. (Doc. 9-13, p. 12).  Mr. McDaniel indicated that he was satisfied with Depakote and did not wish to change his medication.  (Doc. 9-13, p. 12).

Three months later, Mr. McDaniel indicated compliance and satisfaction with his medications, but he reported occasional hallucinations, feelings of hopelessness, and increased anxiety.  (Doc. 9-13, p. 11).  The practitioner scheduled Mr. McDaniel to begin therapy at Indian Rivers. (Doc. 9-13, p. 11).   On January 18, 2019, Indian Rivers closed Mr. McDaniel's case due to inactivity.  (Doc. 9-13, p. 10).

Mr. McDaniel returned to Indian Rivers on June 10, 2019. He reported compliance with medications and denied side effects, suicidal ideations, and hallucinations.  (Doc. 9-13, p. 6).  Mr. McDaniel indicated that his mood was stable and that his sleep and appetite were good.  (Doc. 9-13, p. 6).  The practitioner noted:

> [Mr. McDaniel] says he is tired of being unhealthy and not having insurance.  He feels like he is "ill" and is "tired of the government[.]"[]
> . . . . He most often feels very worthless, unaccepted, unloved, devalued with respect to other people, down, depress, empty, and without a sense of purpose.   He reports he does not enjoy life at this time.  He has had

suicidal thoughts but has never acted on them.  He has no plans to harm himself or other people.  He reports he sees shadow figures.

(Doc. 9-13, p. 6).  The practitioner gave Mr. McDaniel prescriptions for Depakote and Neurontin and asked him to return in two months.  (Doc. 9-13, p. 6).

On August 5, 2019, Mr. McDaniel reported medication compliance and satisfaction at his follow-up appointment at Indian Rivers.  (Doc. 9-13, p. 4).  He denied side effects from his medications, suicidal or homicidal ideations, and hallucinations.  (Doc. 9-13, p. 4).

Mr. McDaniel visited Dr. Hodo for another mental health evaluation on September 23, 2019.  (Doc. 9-13, p. 15).  Mr. McDaniel reported that he had received a diagnosis of bipolar disorder.  Mr. McDaniel had prescriptions for Gabapentin, Propanolol, Omeprazole, and Depakote 500 mg.  Mr. McDaniel said that his medicine "works for awhile, then it doesn't."  (Doc. 9-13, p. 13).  Dr. Hodo stated that Mr. McDaniel "goes to Indian Rivers Mental Health Center and attends regularly."  (Doc. 9-13, p. 15).  Mr. McDaniel stated that he "would like to have more regular visits at the mental health center."  (Doc. 9-13, p. 16).

Mr. McDaniel reported problems with sleep, indicated that he had gained some weight, and stated that he had suicidal thoughts but no attempts.  (Doc. 9-13, p. 14).  Mr. McDaniel discussed his parents' declining health, his family history of alcoholism, and his periods of depression.  (Doc. 9-13, p. 15).  Mr. McDaniel

reported that his medicine for depression did not always help and that he had had some hallucinations which he attributed to a lack of sleep.  (Doc. 9-13, p. 15).

Dr. Hodo noted that Mr. McDaniel was neatly dressed and seemed "very open and direct and answered questions readily."  (Doc. 9-13, p. 15).  Dr. Hodo also noted that Mr. McDaniel "seem[ed] to have some mood swings with periods of increased energy and decreased energy, and with periods of probable mania as well as depression."  (Doc. 9-13, p. 15).  But Mr. McDaniel's thoughts were generally logical, and his sensorium was intact.  (Doc. 9-13, pp. 15-16).  Dr. Hodo reported that Mr. McDaniel did not know who held the office of president or governor for the State of Alabama, and Mr. McDaniel had trouble interpreting proverbs.  (Doc. 9-13, p. 16).  Dr. Hodo's impressions were Manic Depressive Illness and possible early Dementia vs. OBS.  (Doc. 9-13, p. 16).

On the Medical Source Opinion Form, Dr. Hodo noted that Mr. McDaniel had marked to extreme limitations in all areas of mental functioning, but that he could manage funds and that medication helped with his ability to function.  (Doc. 9-13, pp. 17-18).  Consistent with his first evaluation of Mr. McDaniel, Dr. Hodo noted that Mr. McDaniel's condition likely would deteriorate if he were placed under the stress of a job.  (Doc 9-10, p. 110; Doc. 9-13, p. 18).

## II. The ALJ Hearing and Decision

Mr. McDaniel's administrative hearing took place on October 23, 2019.  (Doc. 9-3, p. 33).  Mr. McDaniel's attorney argued that he met the requirements for listing 12.04 (depressive disorder) based on Dr. Hodo's opinion and Mr. McDaniel's Indian Rivers treatment records, emergency room visits, and many hospitalizations.  (Doc. 9-3, p. 35).  Alternatively, Mr. McDaniel's attorney argued "[i]f Your Honor thinks he does not meet 12.04, he certainly would fall within the parameters of 8515." (Doc. 9-3, p. 35).

Mr. McDaniel testified that he had gained 30 pounds or so.  He attributed his weight gain to depression, stating that he did not exercise, and he stayed in bed most of the time.  (Doc. 9-3, p. 36).  He testified that his depression caused him to have no enthusiasm and to feel helpless and hopeless.   (Doc. 9-3, p. 37).  Mr. McDaniel stated that he saw a therapist and a psychiatrist at Indian Rivers after he was hospitalized for suicidal thoughts.  (Doc. 9-3, pp. 37-39).  Mr. McDaniel testified that he still had suicidal thoughts.  He explained that he had had suicidal thoughts the night before the hearing.  (Doc 9-3, pp. 38-39).  Mr. McDaniel said that the psychiatrist prescribed a generic for the medication Depakote for depression, but he could not remember the medication he took for anxiety.  (Doc. 9-3, p. 39).

Mr. McDaniel testified that he lived with his parents and had lived with them off and on for his entire life.  He testified that he did not watch TV because he had

no desire to and that he did not socialize or visit with other people other than his parents.  (Doc. 9-3, p. 40).

Regarding physical pain, Mr. McDaniel testified that he had migraines two to four days a week which he coped with by locking himself in a quiet room with no light.  (Doc. 9-3, p. 38).  Mr. McDaniel testified that he had problems with his lower back that he described as "hurt[ing] so bad that it fe[lt] like somebody [was] sticking [him] with a knife."  (Doc. 9-3, p. 40).  Mr. McDaniel stated that he had gone to emergency room for his chronic back pain and was given medication.  He noted that he was not taking the medication because the emergency room could not give him refills, so he needed to see a doctor at Whatley Clinic.  (Doc. 9-3, p. 40).   Mr. McDaniel described his back pain as a six or seven out of 10.  (Doc. 9-3, p. 41).

Ms. Yudo, a vocational expert, testified that Mr. McDaniel had worked as a construction laborer, a maintenance worker, and a sheet metal mechanic.  (Doc. 9-3, p. 44).  When asked about his work history, Mr. McDaniel testified that he was terminated because he had migraine headaches, stating, "I got let go for my migraine headaches where I did maintenance."  (Doc. 9-3, p. 43).  Mr. McDaniel's attorney asked Ms. Yudo, "[i]f an individual is not able to maintain attention, concentration, and pace for a period of at least two hours, that eliminates all jobs, does it not?"  (Doc. 9-3, p. 44).  Ms. Yudo confirmed that it did.  Ms. Yudo stated that her testimony was consistent with DOT and companion publications.  (Doc. 9-3, p. 45).

22

Following the hearing, the ALJ issued an unfavorable decision.  (Doc. 9-3, p. 13).   The ALJ found that Mr. McDaniel had not engaged in substantial gainful activity since May 21, 2015, the alleged onset date.  (Doc. 9-3, p. 18). The ALJ determined that Mr. McDaniel suffered from the following severe medically determinable impairments:  major depressive disorder and polysubstance abuse. (Doc. 9-3, p. 18 (citing 20 CFR 404.1520(c) and 416.920(c))).  He also determined that Mr. McDaniel suffered from the non-severe impairments of hypertension, hyperlipidemia, GERD, migraines, and lumbar degenerative disc disease.  (Doc. 9-3, p. 19).  Based on a review of the medical evidence, the ALJ concluded that Mr. McDaniel did not have an impairment or a combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 9-3, p. 19).[7]

The ALJ determined that Mr. McDaniel had the RFC to perform:

> a full range of work at all exertional levels but with the following non-exertional limitations: [Mr. McDaniel] is limited to unskilled work as defined in 404.1568(a). (Doc. 9-3, p. 20).  He can apply commonsense understanding to carry out detailed but uninvolved written or oral instructions and can deal with problems involving a few, concrete variables on, or from, standardized situations.

---

[7] The regulations governing the types of evidence that a claimant may present in support of his application for benefits or that the Commissioner may obtain concerning an application and the way in which the Commissioner must assess that evidence changed in March of 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence; Correction, 82 Fed. Reg. 15, 132 (Mar. 27, 2017).  Because Mr. McDaniel filed his application for benefits before March 27, 2017, the new regulations, found at 20 C.F.R. §§ 416.913 and 416.920c, do not apply to his case. *See Morgan v. Comm'r of Soc. Sec.*, 760 Fed. Appx. 908, 911 n.2 (11th Cir. 2019).

(Doc. 9-3, p. 20).  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength."  20 C.F.R. § 404.1568(a).  Jobs are considered unskilled "if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed."  20 C.F.R. § 404.1568(a).

Based on this RFC, the ALJ concluded that Mr. McDaniel could perform his past relevant work as a maintenance worker (DOT 381.687-014), a heavy exertion level unskilled job with an SVP-2, and as a laborer (DOT 869.687-026), a very heavy exertion level unskilled job with an SVP-2.  (Doc. 9-3, p. 24).  Accordingly, the ALJ determined that Mr. McDaniel was not under a disability, as defined in the Social Security Act, at any time after May 15, 2015, the alleged onset date.  (Doc. 9-3, p. 24).

On July 20, 2018, Mr. McDaniel filed with the Appeals Council exceptions to the ALJ's decision.  (Doc. 9-3, pp. 52-53).  The Appeals Council denied Mr. McDaniel's request for review (Doc. 9-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 405(g) and § 1383(c).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for the ALJ's. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If the ALJ's decision is supported by substantial evidence, a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If a district court finds an error in the ALJ's application of the law, or if a district court finds that the ALJ failed to

provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

### I. *Substantial Evidence Supports the ALJ's Rejection of the Consultative Examiner's Opinions*

Mr. McDaniel challenges the ALJ's treatment of two consultative medical opinions. (Doc. 11, pp. 11-13). The ALJ gave little weight to Dr. Houston's opinion and afforded no weight to Dr. Hodo's opinions. (Doc. 9-3, pp. 22-23).

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including the [claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." *Winschel*, 631 F.3d at 1178-79 (citing 20 C.F.R. §§ 404.l527(a)(2), 416.927(a)(2)). Absent "good cause," an ALJ must give the medical opinions of a claimant's treating physician "substantial or considerable weight." *Winschel*, 631 F.3d at 1179 (citing *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997)); 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2). The same treatment is not true for "the opinion of a one-time examining physician." *Thomas v. Berryhill*, 2019 WL 1338899, *3 (M.D. Ala. 2019). The opinions of one-time consultative examiners are not entitled to the deference

accorded the opinions of treating providers who have a longitudinal relationship with a patient. *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); *Williams v. SSA*, 661 Fed. Appx. 977, 979 (11th Cir. 2016).

The ALJ explained that he gave little weight to Dr. Houston's one-time opinion because:

> it is vague, contradictory (the claimant can perform activities of daily living but then notes the claimant is moderately to severely restricted in performing his activities of daily living), addresses issues reserved for the commissioner, appears based on the claimant's subjective reports, and is inconsistent with the claimant's longitudinal treatment record which shows mostly normal mental status exams and reports of improvement with treatment.

(Doc. 9-3, p. 22). Dr. Houston does, in fact, use terms loosely in his opinion, producing seeming contradictions like the one the ALJ noted. But, Dr. Houston did not base his opinion only on Mr. McDaniel's report of his symptoms and experiences. Dr. Houston interviewed Mr. McDaniel's mother, and Dr. Houston reviewed the medical records that DDS provided to him. (Doc. 9-9, pp. 9-10).

Substantial evidence does not support the ALJ's conclusion that Mr. McDaniel's medical records are inconsistent with Dr. Houston's opinion that Mr. McDaniel suffered from major depression. Mr. McDaniel began reporting symptoms of mental illness in 2015 at a visit to the emergency department at Northport Medical Center. (Doc. 9-10, p. 89). Mr. McDaniel was admitted to the hospital in 2015 because he reported that he had a nervous breakdown, made a

27

suicide attempt, and had thoughts of hurting others.  (Doc.  9-10, p. 22).  Mr. McDaniel complained of symptoms of mental illness on five of his ten visits to the emergency room.  (Doc. 9-10, pp. 3, 11, 21, 22, 29).  He received prescriptions for psychotropic medication or was directed to seek psychiatric treatment during two ER visits.  (Doc. 9-10, pp. 18, 26-27).  Records from Mr. McDaniel's visits to Indian Rivers likewise include a diagnosis of Major Depressive Disorder and Poly Substance Abuse.  (Doc. 9-8, p. 148; Doc. 9-10, p. 44).  In records from 14 visits at Indian Rivers, no therapist, social worker, or practitioner reported that Mr. McDaniel had a normal mental status exam.

In contrast, substantial evidence supports the ALJ's conclusion that Mr. McDaniel's symptoms improved when he complied with treatment.  For example, between April of 2017 and August of 2019, Mr. McDaniel visited Indian Rivers seven times, reporting improved symptoms on five of those visits.  (Docs. 9-10, pp. 96, 104; 9-13, pp. 4, 6, 12).  On April 13, 2018 and August 5, 2019, Mr. McDaniel reported compliance with medication, and his records reflect stable mood, good sleep and appetite, and elimination of hallucinations.  (Doc. 9-13, pp. 4, 12). Substantial evidence also supports the ALJ's finding that Mr. McDaniel "was not consistent in his treatment and would miss visits, run out of medication, and then develop increased symptoms." (Doc. 9-3, p. 22; *see*, *e.g.*, Doc. 9-10, pp. 95-96, 104; Doc. 9-13, p. 10).  Therefore, substantial evidence supports the ALJ's decision to

give little weight to Dr. Houston's opinion because of contradictions within the

opinion and because Dr. Houston did not account for the fact that Mr. McDaniel's

depression improved and he was stable when he complied with his prescriptions.

> Regarding Dr. Hodo's two consultative opinions, the ALJ stated:

> At both visits Dr. Hodo examined the claimant and diagnosed the claimant with maniac [*sic*] depressive illness and the second visit possible early dementia vs. OBS.  During the visits the claimant reported having marked problems with sleeping, thoughts of suicide but never made an attempt, weight gain concerns, and that he takes medication which helps for a while then stops helping.  During the claimant's first mental status exam, the claimant was noted as appearing anxious with some degree of depression, somewhat blunted effect, had flight ideas and trouble concentrating, reported suicidal ideation but no intent.  During the claimant's second mental status exas [*sic*] he was neatly dressed, open and direct at answering questions, reported mood swings and periods of increased or decreased energy but had logical thoughts.  Dr. Hodo noted the claimant appeared to be under a lot of stress from taking care of his 2 parents.  Outside of the claimant's subjective reports his mental status exam at the second visit was normal.

> Dr. Hodo filled out a medical source statement form by circling options, and noted the claimant had marked to extreme limitations in all areas of mental functioning, but that the claimant could manage funds and would deteriorate if placed under the stress of a job at both visits (Exhibits B14F and B19F).  The undersigned notes that the variation in the 2 mental status exam [*sic*] can be explained by the claimant's inconsistent treatment and possibly being off his medication.  The undersigned affords no weight to these opinions as they are inconsistent with the second mental status exam by Dr. Hodo, and are inconsistent with the claimant's treatment records, which also show significant improvement with medication (Exhibits B12F, B13F, and B18F).  The undersigned notes that even when off his medication, his treatment at Indian River [*sic*] does not support any marked or extreme limitations.

(Doc. 9-3, p. 23).

Substantial evidence supports the ALJ's decision to give no weight to Dr. Hodo's opinions. Both of Dr. Hodo's narrative opinions are brief and rely heavily on Mr. McDaniel's self-reports. Mr. McDaniel's medical records contradict much of the information that he provided to Dr. Hodo. For example, during his first visit with Dr. Hodo, Mr. McDaniel reported that he was taking Depakote and that if he missed a day or two, he was more irritable. (Doc. 9-10, p. 107). But during his December 20, 2017 visit at Indian Rivers, Mr. McDaniel reported that he had not taken Depakote for several months. Mr. McDaniel did report that he felt better when he took Depakote, and he asked for a new prescription. (Doc. 9-10, p. 104). During his September 23, 2019 visit with Dr. Hodo, Mr. McDaniel told Dr. Hodo that he regularly attended Indian Rivers Mental Health Center, (Doc. 9-13, p. 15), but Mr. McDaniel's records from Indian Rivers indicate that he routinely missed appointments and that on January 18, 2019, Indian Rivers closed Mr. McDaniel's case due to inactivity. (Doc. 9-13, p. 10).

For these reasons, substantial evidence supports the weight that the ALJ assigned the opinions of consultative examiners Dr. Houston and Dr. Hodo.

## II. *The ALJ Did Not Err in Finding that Mr. McDaniel Did Not Meet Listing 12.04.*

Mr. McDaniel argues that the ALJ erred at step three by finding that he did not meet listing 12.04 for depressive disorder. (Doc. 11, p. 14). Mr. McDaniel

contends that "[t]he ALJ performed only a perfunctory review of the requirements for Listing 12.04 and failed to address SSR 85-15 at all." (Doc. 11, p. 17).

For a claimant to demonstrate that his impairment meets a Listing, the impairment "must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in *Sullivan*). To meet the criteria for depressive disorder under Listing 12.04, a claimant must have medical documentation of at least five of the following symptoms (paragraph A): depressed mood; diminished interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; observable psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; or thoughts of death or suicide. 20 C.F.R. 404, Subpart P, Appendix 1, Listing 12.04. The claimant also must have medical documentation of extreme limitation in one or marked limitation in two of the following areas of mental functioning (paragraph B): understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; adapt or manage oneself. 20 C.F.R. 404, Subpart P, Appendix 1, Listing 12.04. If the claimant does not meet the listing under paragraphs A and B, then he can meet the listing by providing evidence that his mental disorder is serious and persistent, is medically documented over a

period of at least two years, and produces only marginal adjustment with medical treatment. 20 C.F.R. 404, Subpart P, Appendix 1, Listing 12.04.

To determine whether Mr. McDaniel's mental impairments met or medically equaled the criteria of 12.04, the ALJ considered whether the paragraph B criteria were satisfied. (Doc. 9-3, p. 19). Based on Mr. McDaniel's medical records, the ALJ found that the Mr. McDaniel had no limitation in understanding, remembering, or applying information; a mild limitation in the area of interacting with others; a moderate limitation regarding concentrating, persisting or maintaining pace; and no limitation in adapting or managing oneself. (Doc. 9-3, p. 19). To support his finding, the ALJ discussed Mr. McDaniel's testimony from the administrative hearings and Mr. McDaniel's reports to mental health care providers. (Doc. 9-3, p. 19). The ALJ also discussed Dr. Houston's opinions about Mr. McDaniel's limitations. (Doc. 9-3, p. 19). Based on these findings, the ALJ determined that the paragraph B criteria were not satisfied. (Doc. 9-3, p. 19).

Next, the ALJ considered whether Mr. McDaniel satisfied the criteria for paragraph C. (Doc. 9-3, p. 20). The ALJ determined that Mr. McDaniel did not meet the paragraph C criteria for listing 12.04 because Mr. McDaniel did not have "a medically documented history of chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work

activities with symptoms or signs currently attenuated by medication or psychosocial support . . . ."  (Doc. 9-3, p. 20).

The ALJ applied the three-part standard properly and considered all the medical evidence, including Mr. McDaniel's subjective statements, in finding that Mr. McDaniel did not meet the criteria for paragraph B or C.  Significantly, Mr. McDaniel relies heavily on the consultative opinions from Dr. Houston and Dr. Hodo in arguing that he met Listing 12.04, and the ALJ properly discounted those consultative opinions.  Therefore, the ALJ properly found that Mr. McDaniel did not meet or medically equal the criteria of listing 12.04.

Mr. McDaniel's argument that the ALJ did not discuss SSR 85-15 is without merit.  In his discussion of Mr. McDaniel's exertional limitations, the ALJ found that Mr. McDaniel was limited in "understanding and carrying out detailed but uninvolved written or oral instructions and dealing with problems with few concrete variables.  The ALJ elaborated stating:

> Social Security Rulings 85-15, as reinforced by Social Security Ruling 96-9p, specifies that the basic mental demands of competitive, remunerative work include the abilities on sustained basis to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting.  The claimant has the ability to understand, carry out, and remember simple instructions.  He can respond to supervision and coworkers without problem and deal with changes in routine work settings.

(Doc. 9-3, p. 24).  The ALJ determined that Mr. McDaniel could meet the demands of unskilled work. (Doc. 9-3, p. 24).

The ALJ properly considered Mr. McDaniel's limitations, and substantial evidence supports the ALJ's determination that Mr. McDaniel he did not meet Listing 12.04 or SSR 85-15.

## CONCLUSION

For the reasons discussed above, the substantial evidence supports the ALJ's decision, and the ALJ applied the proper legal standards.  The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner.  Accordingly, the Court affirms the Commissioner's decision.  The Court will enter a separate judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this January 4, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE